UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 22-CR-10103-LTS |
| ERNEST JOHNSON, a/k/a "Yo Pesci," | |
| Defendant | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION AND RESPONSE TO OBJECTIONS TO PRESENCE REPORT**

The Defendant has pleaded guilty to being a felon in possession of a firearm.  While the Defendant was charged with one firearm, the sentencing guidelines properly hold him accountable for his role in the Caruso Drug Trafficking Organization ("Caruso DTO" or "DTO"). The Caruso DTO trafficked in over 30 kilograms of fentanyl, in the form of hundreds of thousands of pressed fentanyl pills designed to imitate Percocet 30 mg tablets. The Defendant furthered the aims of the DTO largely through the firearms he possessed, the threats he made to rival drug dealers, and cultivating the DTO's violent reputation through his online videos. The government recommends that this Court impose a sentence of 120 months, which is the statutory maximum. A 120-month sentence properly reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient but not greater than necessary to accomplish the goals of sentencing.

**THE ADVISORY SENTENCING GUIDELINES**[1]

On May 19, 2022, the Defendant waived indictment and pleaded guilty to a one count Information charging felon in possession of firearm and ammunition, in violation of 18 U.S.C. §

---

[1] References are as follows: docket entries in this case by entry number (ECF #_); related case docket entries by docket number and entry number (Docket No. __, ECF # _); presentence investigation report (PSR) are by paragraph (PSR ¶_) or page (PSR, p. _); and exhibits to this sentencing memorandum by letter (Exhibit _).  The U.S. Probation Department is referred to as "Probation."

922(g)(1) (ECF# 56).  The parties entered into a Plea Agreement pursuant to Fed. R. Crim. P.
11(c)(1)(B) (ECF #52), whereby the Defendant agreed to recommend a sentence of no less than 60
months.  The government agreed to recommend a sentence within the guideline sentencing range
calculated by the government in the plea agreement.

## I.    OFFENSE LEVEL CALCULATION

In the plea agreement, the government calculated the total offense level to be 29.  Probation's
calculation of the offense level accords with that set forth in the Plea Agreement (PSR ¶¶223-236).
The offense level calculation set forth in the Plea Agreement (ECF #52), and found by Probation (PSR
¶¶223-236) is recited here:

| | |
|---|---|
| *Base Offense Level*: | 20, under USSG § 2K2.1(a)(4), because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine, and the offense involved a firearm described in 26 U.S.C. § 5845(a); |
| Offense Characteristics: | +4, under USSG § 2K2.1(b)(1)(B), because the offense involved 8 to 24 firearms; |
| | +4, under USSG § 2K2.1(b)(4)(B), because a firearm had an obliterated serial number; |
| | +4, under USSG § 2K2.1(b)(6)(B), because the Defendant used or possessed any firearm or ammunition in connection with another felony offense; and |
| *Acceptance of Responsibility*: | -3, because the Defendant has clearly demonstrated acceptance of responsibility, under USSG § 3E1.1. |
| <u>*Total Offense Level:*</u> | <u>29.</u> |
| Criminal History Category: | 12 points (PSR ¶249), Category V (PSR ¶250) |
| Guidelines Sentence Range: | 140-170 months. |

### A.    Defendant's Objection

The Defendant's only substantive objection to the offense level calculation in the PSR relates
to the enhancement for the number of firearms.  <u>See</u> PSR ¶226.  Even so, the Defendant acknowledges
that he is responsible for at least seven firearms.  For this offense characteristic, the Defendant's own

words demonstrate the number of firearms is properly calculated.  As the Defendant enthusiastically put it, "we got… plenty of them thangs, I'm not going to incrimize (sic) myself, we got… plenty of them thangs," while proceeding to throw three firearms in the air.[2]  The government agrees.

The government offers the following list of firearms that were specifically associated with the Defendant, by actual possession, depiction, or reference in a photo or video contained in Exhibit 1:

1. Taurus PT-145 (recovered from the Red Roof Inn, substantively charged in Count One; PSR ¶¶136-138);
2. White AR-style rifle recovered on May 5, 2021 (see PSR ¶¶68-78)
3. Glock 17, Gen-4, obliterated serial number, with fully automatic switch (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
4. Smith and Wesson, .357 caliber revolver, bearing serial number 17548 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
5. Glock 30, .45 caliber firearm bearing serial number TWH665 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
6. Smith and Wesson, 9mm firearm serial number FWX5456 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
7. Smith and Wesson, .380 caliber revolver, bearing seiral number KCC 2712(recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
8. Glock 43x, 9mm firearm bearing serial number ADYB131 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
9. Ruger Redhawk .44 magnum revolver, bearing serial number 50404788 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)
10. Glock 36 .45 caliber pistol serial number BGHT946 (recovered from 1 Reliance Row; PSR ¶¶129)
11. Tan and black Springfield XDS .40 caliber firearm, depicted in videos but not recovered (e.g., PSR ¶¶109, 173, 174; Exhibit 1)

## ARGUMENT

## I.   THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 REQUIRE A SENTENCE OF 120 MONTHS

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  Among those factors are the "nature and circumstances of the offense," and the history and characteristics of the Defendant. See 18 U.S.C. § 3553(a)(1).. The sentence must also "reflect the

---

[2] See Exhibit 1, "2021-06-10 - Pesci Video - Plenty of Them Thangs.mp4" (the Glock 43x, and one revolver are discernible in the video).

seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." See 18 U.S.C. § 3553(a)(2)(A).  The sentence must also afford "adequate deterrence" for both the defendant and others (18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").  Lastly, the sentence must protect the public from the further crimes of the Defendant.  See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant").

To be sure, the government readily could have charged the Defendant with additional firearm counts, and drug conspiracy charges that would have increased the statutory maximum and potentially adjusted the GSR upward. However, in coming to the Plea Agreement, the Defendant acknowledged the overwhelming evidence and promptly accepted responsibility.  In formulating the charging decision, and entering into the agreement, the government considered the Defendant's lesser-role in the DTO, and his criminal history. Given the opportunity to immediately resolve the case for a serious, lengthy, and proportional sentence, the parties agreed that the best means to do so would be the Defendant pleading guilty to the most readily provable charge that would also hold him accountable at sentencing for the full breadth of his conduct as part of the DTO.   As such, consideration of the § 3553(a) factors demonstrates that a sentence of 120 months is sufficient, but not greater than necessary, to meet the goals of sentencing.  For this Defendant, upon consideration of all the sentencing factors, 120 months is appropriate and warranted.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of this case merit a sentence of 120 months.  The Defendant brazenly possessed numerous firearms while prohibited due to numerous prior felony convictions.  He possessed firearms in videos on Facebook. He possessed firearms in videos on Instagram. He possessed firearms in connection with threats to rival drug dealers. He possessed the firearms in hotel rooms, and in drug stashes.  The firearms included a fully automatic Glock 17, an AR-style rifle, multiple large

caliber revolvers, and a number of pistols, equipped with large-capacity magazines. This Defendant exemplifies the individual who should be prohibited from possessing firearms and must be severely punished for doing so.

What's more, the Defendant possessed all of these firearms while he was a member of the Caruso DTO. The Caruso DTO was operated and run by the Defendant's close friend, Vincent CARUSO, a/k/a "Fatz." The DTO was a sprawling and extensive enterprise that operated for years in Essex County,[3] specializing in the manufacture and sale of "blues" or "perc 30s", which are pressed fentanyl pills designed to imitate Percocet.[4] The Defendant was a member of this DTO, serving in a security role as CARUSO's driver and personal assistant. As a member of the DTO, the Defendant bears culpability for the pills that his associates and coconspirators were distributing. Though the Defendant is not charged with a drug count, a 4-level increase under the guidelines applies due to his possession of the firearm in connection with the Caruso DTO.

And this was no mere felony offense. Rather, the Defendant was a member of a sprawling DTO that moved over 30 kilograms of fentanyl and supplied dealers across the region with hundreds of thousands of pills. For example, a single resupply taking place on May 19, 2021 that was filmed by Vincent CARUSO in a Snapchat recording, depicts over 50,000 pills being packaged into smaller 1000-pill packages (PSR ¶¶95-98). Multiple cooperating witnesses described these resupplies taking place once a month for about a year (from June 2020 through June 2021), equating to 500,000 pills. See PSR ¶¶22-26, 156-185.

---

[3] The government references its sentencing memorandum in the Vincent CARUSO case, which details the historical crimes committed by the CARUSO DTO, including those crimes which predate the Defendant's involvement. *See* Exhibit 7; U.S. v. Vincent Caruso, Crim. No. 21-10312-DJC, ECF #84 (sentencing memorandum).

[4] As noted by DEA in reporting (see e.g., ECF #2-1), pressed fentanyl pills have grown in prevalence in recent years and are a primary driver of the opioid epidemic plaguing Massachusetts, and Essex County in particular. During the period of 2018 through 2022 while the DTO was in operation, over 1000 people have died from opiate abuse in Essex County alone, to say nothing over the thousands of others who died in neighboring counties and New Hampshire.[4] The DTO distributed hundreds of thousands of these pressed fentanyl pills, spreading untold despair, misery and death to those afflicted by substance abuse disorder, and generating an obscene amount of profit for her son, herself and the DTO.

This Defendant certainly participated.  On a daily basis, the Defendant would drive CARUSO around in one of the DTO's vehicles (which included a Mercedes S550) while CARUSO engaged in phone conversations with customers and suppliers and arranged for the purchase of tablet presses. Given this weight, and the hundreds of thousands of pills distributed by the DTO, the government makes no exaggeration in its argument that the Caruso DTO was the source of a sizeable percentage of the fentanyl pills in the area northeast of Boston.

### 1.   Profits and Proceeds

Pressed fentanyl pills are an extremely lucrative corner of the illicit drug market. See e.g., PSR ¶¶162-165.  At a minimum, each kilogram of fentanyl, even if minimally adulterated, can yield tens of thousands of fentanyl pills, if not 100,000.  See PSR ¶182.  Depending on quality, they can be sold at high prices to those believing they are buying pharmaceutical grade Percocet.  Irrespective of the market, there is profit for every layer of distribution chain due to the exponential volume of pills that can be generated from small quantities of raw fentanyl.  Thousands of these pills flowed through the DTO to street dealers, and in turn to those suffering from substance abuse disorder.  In exchange, the DTO, Vincent CARUSO, and this Defendant reaped tremendous profits.

The takedown for the Federal investigation in June 2021, revealed that the Caruso DTO's business was booming. Over $85,000 in cash was recovered on the day of the takedown alone.  In Vincent CARUSO's residence, two diamond encrusted chains were recovered: one bearing Vincent CARUSO's street-name, "Fatz", and the other bearing an effigy of former DTO member C.M.  See PSR ¶¶106-1086.  The Defendant would wear frequently wear the diamond-encrusted C.M. chain in numerous internet videos. Videos contained on Exhibit 1 provide a glimpse into a day's profit: a large amount of cash is being counted by Vincent CARUSO and Ernest JOHNSON in a money counter. See Exhibit 1 ("Johnson Instagram, Cash on Bed - unified_message_453842389059843.mp4").

Records from The Brook casino in New Hampshire, showed that the DTO wagered (and lost)

over \$400,000 in cash over a four-month period.  See PSR ¶¶117-154. These \$2,000 to \$5,000 dollars parlay-style bets were being placed nearly every other day.  See PSR ¶¶117-154.  For example, surveillance footage from the casino for one such trip in May 2021, showed the Defendant literally carrying a bag of cash into the casino that would be gambled away and lost:

 

From all this, the Court can gather a sense of the profits generated by this DTO in a few short months. The DTO was so profitable that it literally gambled nearly half of a million dollars from February 2021 to June 2021 and had plenty of cash and assets to spare when its locations were raided by FBI in June of 2021. The profits of the DTO's crimes were spent on firearms, luxury goods, designer shoes, chains, automobiles, diamond-encrusted watches, and gambling.

### 2.  Videos

While a conspiracy rarely wears its heart on its sleeve, this Defendant clearly did not abide by that code.  This was an extremely violent drug enterprise that accumulated weapons, hurt others and orchestrated a campaign of street violence. The Defendant played a rather unique role as something of an internet spokesman for the DTO and its activities. He live-streamed videos that threatened rival drug dealers, accused people of being informants for law enforcement, showcased the DTO's arsenal

of firearms and large-capacity magazines, and promoted the DTO's reputation for violence and gunplay. In short, after trading in death and misery, the Defendant would then take to the internet to brag about his exploits and explain his willingness to commit violence against rivals of the DTO.

Underneath the veneer of comedy and entertainment and the gratuitous use of the word "allegedly," the Defendant's videos did not leave much to the imagination. The "Yo Pesci" show was not merely entertainment.  In these "Yo Pesci" livestreams, the Defendant can be seen discussing his crimes, handling firearms, flipping them in the air to emphasize his threats, and referring to large-capacity magazines and machineguns that the DTO had in their possession. For example, in a single night the Defendant threatened rival drug dealers, discussed a violent confrontation at a local strip club, and displayed large amounts of cash. In truth, they were brazen online narrations of actual violence, firearms, drug dealing, and threats that the Caruso DTO put in motion on the street.

A number of examples are contained in Exhibit 1, and some further instances follow:

- A video posted to the Yo Pesci Instagram account on June 9, 2021, depicts the Defendant in the basement of CARUSO's residence at 1 Reliance Row. The camera pans to a bed and a firearm is visible on the bed.  JOHNSON realizes that he is livestreaming a firearm and quickly jerks the camera away, and states "oh shit I'm bugging, I'm showing poles on my bed and shit."  A still image from the video depicting the firearm follows, with a red box superimposed over the firearm:



- On June 20, 2021, the Defendant posted a video to the Yo Pesci Instagram.  During the video the Defendant spends most of the video dancing to a song, and then pulls a firearm from his pocket and points it at the camera.  The Defendant then puts the firearm in a satchel that he has been seen carrying in numerous other videos.  The Defendant later claims it is a "prop gun" and states, "fuck the police."   A still image from this video of The Defendant holding the firearm follows:



- On June 26, 2021, the Defendant posted a video to the Yo Pesci Instagram account where he can be observed holding a firearm with an extended magazine.  The Defendant then places the firearm back into what appears to be a Gucci bag.



- In another video posted to Yo Pesci Instagram on June 10, 2021, the Defendant recounts a violent confrontation taking place at The Squire lounge in Revere during the night before. The Defendant also addresses various rival drug dealers and calls them "rats" for speaking with police. The Defendant repeatedly states, "we got plenty of them thangs," referring to firearms and then flips what appear to be a series of firearms in the air in front of the camera, and states "we ready to go to war." The Defendant then asks, rhetorically, where are his "few drums at" (meaning large-capacity drum magazines) and where are "a couple of his thirty moppers" (meaning thirty round magazines), as he searches around the basement. A still image from the video showing the green Glock 43x firearm (received from 12 Fremont Place) that the Defendant flips into the air follows:



The FBI certainly learned for themselves where the Defendant's "drums" and "thirty moppers" were "at" on June 30, 2021, when search warrants were executed. At 12 Fremont Place, Lynn, CARUSO's grandmother's house and DTO stash location, agents located more than six firearms,

including the green firearm (a Glock 43x 9mm firearm bearing serial number ADYB131) seen in this video, the fully automatic Glock 17, along with two 30 round magazines and a 50 round "drum" magazine. See PSR ¶¶95-116. At 285 Lynn Shore Drive, the CARUSO DTO's stash location, agents would locate two more "drum" magazines. See PSR ¶¶119-121. At the Defendant's residence where he lived with CARUSO, agents located a Glock 36, .45 caliber firearm, and ammunition. See PSR ¶¶129-130. Images of the recovered handguns follow (Exhibit 2):






The Defendant certainly knew the DTO had a fully automatic weapon. In a video sent by Vincent CARUSO to numerous individuals on Snapchat, the Defendant can be seen looking on approvingly as CARUSO handles this machinegun with a 30-round magazine,[5] and in a video the

---

[5] See Exhibit 1, "2021.06 - Machinegun Video.mp4". The Defendant, as is customary, is driving, while CARUSO sits in the passenger seat filming their exploits. Other videos posted by CARUSO show him holding the machinegun, while the Defendant inferably operates the vehicle. See Exhibit 1 ("fatzsl52 - Snapchat video, Glock 17, 9mm, Selector Switch, Video 1 - 2021-06-25, 4.27 am.mp4"). The songs playing in the background of these videos are by Kelvin BARROS, a/k/a "7981 Kal," who also faces charges in this District.

Defendant posted to his own social media in June 2021, he bragged the general public, "I got 31 for these ni**as, with the switcheroo," referring to a 31-round magazine for his fully automatic weapon.[6]

Of course, these firearms were not just "props gun," as the Defendant repeatedly claimed.  The Defendant and Vincent CARUSO put these firearms to work, kept them on hand for protection, and the Defendant carried one everywhere he went – even to the Red Roof Inn in Saugus.  See PSR ¶¶19, 38, 47, 95-116. These firearms and the violence were all oriented toward the specific goal of increasing the reputation of Vincent CARUSO, the Defendant, and the DTO on the street.  See Exhibit 1.

### 3.  Violence

This Court must also consider the two serious incidents of violence that the Caruso DTO engaged in while the Defendant was a member. To be sure, the Defendant was on the periphery of the actual violence that took place and the government does not claim that he was a shooter.  However, the Defendant was an enthusiastic member of the DTO at the time of these incidents, and certainly knew that coconspirators would engage in robberies and shootings consistent with the threats that he issued in his videos.  Therefore, he should be held accountable under the guidelines for the conspiracy's reasonably foreseeable conduct.  See USSG § 1B1.3(1)(B).

### a.  May 4, 2021, Attempted Robbery

Of note, the government believes that there is sufficient evidence for the Court to consider the Defendant's involvement in an attempted robbery taking place in Saugus in May 2021.  For this incident, members of the DTO targeted the victim as he walked to his vehicle.  See PSR ¶¶64-78.

Surveillance video shows the victim leaving an apartment building and walking to his car.  As he does so, a vehicle drives down the hill towards the victim, while a known suspect referred to as D.M. runs up to the victim holding a white AR-15 rifle pointed at the victim. A second suspect joins, and a struggle ensues with the victim.  During the struggle, the victim runs off.  Shortly thereafter,

---

[6] See Exhibit 1, "2021.06.28 - Got 31 for them with the switcheroo.mp4".

police responded.  The responding officers observed D.M. and chased him.  D.M. ran from police, and threw the AR-15 rifle into a dumpster (the weapon was later recovered).  D.M. then ran across Route 1 Southbound, vaulted the median fence, and crosses over Route 1 Northbound.

As noted in the PSR, the government has developed extensive evidence linking the Defendant, Vincent CARUSO, and D.M. to this incident that appears to have been undertaken at Vincent CARUSO's request using a weapon that the DTO possessed, and the Defendant can be observed holding in an image on his Instagram.[7]  Investigators recovered images of the Defendant holding what appears to be the same AR-15 rifle on social media (PSR ¶75), one of which follows:

 

Lastly, a recording sent by the Defendant a few hours after the failed robbery identifies Vincent CARUSO as the orchestrator: "If this is such my fault, who's the one that sent all of us to do this. C'mon man.  That's some lame ni**a shit." PSR ¶¶77-78.

### b.  June 29, 2021, Machinegun Shooting

The most disturbing act of violence, however, is the June 29, 2021, shooting where the DTO's fully automatic handgun was used to spray rounds in a residential neighborhood, striking multiple

---

[7] D.M. was dropped off at a Boston hospital for a gunshot wound the following morning.  D.M. was captured on surveillance exiting a vehicle known to have been rented by BENTON and in use by the DTO at the time and was wearing an oversized melon-colored sweatshirt consistent with one owned by Vincent CARUSO. Vincent CARUSO and D.M. had a text message conversation while D.M. was in the hospital where they discussed the incident and whether the firearm was recovered from the dumpster.  See PSR ¶¶64-78.

victims.  See PSR ¶¶106-117.  The motive behind this shooting is believed to be retaliation for a close associate of the DTO, M.A., being shot in Peabody a few days beforehand.

Shortly after the associate was shot, in the early morning of June 25, 2021, the Defendant and Vincent CARUSO began driving around with firearms, including specifically a fully automatic Glock 17, 9mm firearm with a selector switch and 30-round magazine. The government is aware of this because Vincent CARUSO filmed videos of them doing so, and sent them over social media.  See PSR ¶¶109-110; Exhibit 1 ("fatzsl52 - Snapchat video, Glock 17, 9mm, Selector Switch, Video 1 - 2021-06-25, 4.27 am.mp4"). The timestamps of these videos are June 25, 2021, at 4:47 a.m., which was right after the associate was shot, and June 26, 2021, at 4:09 p.m., a day later.  See PSR ¶¶109-110.

The entire DTO discussed the significance of M.A. being shot. Indeed, the Defendant referenced it in a publicly posted video on Facebook a few hours after the shooting. In the live video, the Defendant claimed that there "there would have been hell to pay" if his "little man," referring to M.A., died." PSR ¶186. The Defendant then states that "there still gonna be hell pay" even though M.A. survived. The Defendant explains, with respect to those responsible for the shooting, that he is going to going to "put their houses on curfew every trip", "like [he] been doing" and that "it is going to really be crunch time on them ni**as." PSR ¶186; Exhibit 1, "Yo Pesci Facebook - 2021.06.25 - Hell to Pay Video.mp4".

Then, on June 28 into June 29, 2021, the fully automatic Glock handgun was now in the hands of D.M. who put it to use.[8]  At 12:03 in the morning on June 29, 2021, over 30 rounds were fired at a group of individuals gathered around a porch on Arlington Street in Lynn, Massachusetts.  The gunfire was captured on video and audio; the sound is unmistakably a fully automatic and the shooter strafes as he unloads his magazine.[9]  The group of victims scattered.  Lynn Police responded and recovered

---

[8] This is the same D.M. from the May 4, 2021, attempted robbery.

[9] Surveillance video from the shooting is contained on Exhibit 1. See Exhibit 1 ("2021.06.29 - Arlington Street Shooting Video.mp4"; "2021.06.29 - Arlington Street Shooting Video - 2nd.mp4").

31 shell casings in 9mm and .45 caliber, consistent with two shooters.  Multiple victims had been struck, and nearby homes and vehicles were riddled by the projectiles.  See PSR ¶110.

Ten minutes before the shooting, Vincent CARUSO activated a police scanner application on his cellular phone (PSR ¶117). A few minutes after the shooting, Vincent CARUSO reviewed a social media post concerning the shooting and sent Laurie CARUSO a news article regarding it (PSR ¶¶118-119).  Vincent CARUSO also had voice calls with the shooter about 45 minutes before and 40 minutes after the shooting (PSR ¶120).

Later that night, Vincent CARUSO engaged in a text message conversation with the shooter on June 29, 2021, at 9:21 p.m.  See PSR ¶115. The shooter tells Vincent CARUSO he will grab the "shit in da trunk tomorrow", "all my shit there", "My shit in" "There", which is a reference to where the Glock 17, 9mm machinegun was recovered at 12 Fremont Place (PSR ¶115; Exhibit 2). The shooter then asks Vincent CARUSO, "You can get rid of the hoodie an sweats?", and CARUSO replies, "Ya I'll do that when I get home" (PSR ¶115). The shooter tells CARUSO, "don't throw the ski mask out I'm a wash it" (PSR ¶115).  On June 30, 2021, at 12:57 a.m., CARUSO replied, "Done" (PSR ¶115). The digital evidence developed in this case proves that CARUSO and the Defendant returned to Lynn around this time and destroyed the clothing, as the shooter asked.  See PSR ¶117.

Five hours later, FBI executed a search warrant at 12 Fremont Place and located a cache of weapons in the trunk of a vehicle in the garage.  Among these weapons was the Glock 17, 9mm firearm with selector switch (PSR ¶¶122-125).  A mask was also found in the trunk as well (PSR ¶116).  The Glock 17, 9mm firearm with selector switch was matched by tool-marking comparison to the casings recovered from the shooting on Arlington Street. See Exhibit 5.

While the Defendant is less culpable for this incident than Vincent CARUSO, the Court should be mindful of the serious nature of the violence that the Defendant participated in as part of the DTO. In this context, the Defendant's threats and online rantings are not "entertainment" by any stretch. They were narrations of actual gun violence that shattered the sense of security for neighborhoods in Lynn.

17

This understanding is reflected in the government's recommendation of 120 months.

### 4. Conclusion

From the foregoing, the Court can discern the necessity of a ten-year sentence. This sentence has been well earned. The spokesman for this violent, street-oriented drug trafficking organization must be held accountable in proportion to his role and conduct. All told, a ten-year sentence reflects the nature and circumstances of these facts. See 18 U.S.C. § 3553(a).

### B.      History and Characteristics of the Defendant

The government considered the Defendant's criminal history and characteristics in making its charging decision, and sentence recommendation. To that end, the Court should go no lower than the government's recommendation of 120 months, and for good reason. Probation properly calculated the Defendant's criminal history to be category V (PSR ¶¶249-250). The Defendant's criminal history was hard-earned.

In 2012, the Defendant was arrested for violating an abuse prevention order, sentenced to probation, which he violated, and was incarcerated for 5 months (PSR ¶241).

In 2017, the Defendant was convicted for firearms offenses related to an emergency housing shelter, where the Defendant was residing with his girlfriend and their two-year old child (PSR ¶242). Officers responded and recovered a firearm, ammunition and a BB gun in the Defendant's room that he shared with the girlfriend and child (PSR ¶242). Shortly thereafter, the manager of the emergency shelter began receiving threatening phone calls from the Defendant. The Defendant threatened to "shoot up the place," because the recent firearm arrest prompted Department of Children and Families to remove custody of their child (PSR ¶243). The Defendant pleaded guilty to both offenses and received about 5 months of jail time.

While serving a sentence in the Worcester House of Correction, a correctional officer observed the Defendant to have a white powder substance on his upper lip and nostrils (PSR ¶244). A

correctional officer found a bag of Xanax pills in the Defendant's possession (PSR ¶244). The Defendant served 6 months for this offense. Shortly thereafter, while still serving that sentence, the Defendant threw a milk carton at a correctional officer that was full of urine (PSR ¶245). The Defendant threw the milk carton through the small door used to pass food items to detainees in their cells. The correctional officer was hit in the face, neck, upper arm, and chest; his uniform was soaked with the Defendant's urine (PSR ¶245). This would not be the only instance where the Defendant used bodily substances to assault correctional officers while in jail.

In 2018, the Defendant was charged in a 22-count complaint with a number of incidents taking place while he was serving a sentence in the Essex County House of Correction. These incidents took place from November 2018 through January 2019 and included: nine counts of assault and battery on a correctional officer by bodily substance; one count of assault and battery on a correctional officer (because it was an unknown liquid); and eleven counts of threats (PSR 246). The Defendant pleaded guilty to this case and was sentenced to 1 year in the house of correction consecutive to the sentence he was then-serving. The specific allegations taken from the criminal complaint (Exhibit 6) follow:[10]

| Date | Crime |
|---|---|
| 11/2/2018 | Defendant intentionally stepped on a bag of urine, spraying it on a male correctional officer |
| 11/3/2018 | Defendant spit on a correctional officer |
| 11/3/2018 | Defendant threw a cup of urine at a correctional officer, hitting him in the face, pants and jacket |
| 11/11/2018 | Defendant spit in the face of a correctional officer |
| 12/14/2018 | Defendant stepped on a bag full of urine spraying it on a correctional officer |
| 12/17/2018 | Defendant spit on a correctional officer |
| 1/8/2019 | Defendant spit on a correctional officer |
| 1/8/2019 | Defendant threw urine on a correctional officer hitting him in the legs and boots |
| 10/31/2018 | Defendant threatened to shoot a correctional officer |
| 11/4/2018 | Defendant threatened to sexually assault a female correctional officer |
| 11/4/2018 | Defendant threatened to throw urine on a correctional officer |
| 11/4/2018 | Defendant threatened to kill a correctional officer |
| 12/10/2018 | Defendant threatened to assault staff with a chair |
| 12/12/2018 | Defendant threatened to throw urine at a correctional officer |

---

[10] The government has attached the Court papers for this conviction as Exhibit 3.

| 12/14/2018 | Defendant threatened to kill a correctional officer |
|------------|-----------------------------------------------------|
| 12/14/2018 | Defendant threatened to assault staff |
| 12/16/2018 | Defendant threatened to kill a correctional officer |
| 12/28/2018 | Defendant threatened to kill a correctional officer |
| 12/28/2018 | Defendant threatened to kill a correctional officer |
| 1/7/2019 | Defendant threatened to assault a correctional officer |

All of these convictions, of course, arose in the context of the numerous arrests for cases for which no conviction resulted, and pending cases in Georgia and Massachusetts, for which the Defendant is currently in default. See PSR ¶¶ 252 (giving false name to officer, Georgia), 253 (collision with parked vehicle, Georgia),[11] 254 (credit card fraud), 259 (threats), 260 (larceny), 262 (home invasion). Accordingly, this Court should confidently impose the 120-month sentence, because it properly accounts for the violent history and characteristics of this Defendant.

**C.     Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Based on the foregoing, a sentence of 120 months is necessary to reflect the seriousness of the offense. The DTO was sophisticated and longstanding, and the Defendant's role and participation in the firearm-side of the business should not be met with leniency. Indeed, it is the Caruso DTO's venturing into violence and fully automatic weapons that should be met with the most severe penalties. Without question, the seriousness of the offense, the violence, the number and nature of the firearms – specifically, the AR-rifle and Glock machinegun - and the amount of fentanyl that the DTO moved, merits a sentence of at least 10-years. The sentence range was negotiated by the parties, and reflects considerable leniency on the part of the government, while still accounting for the seriousness of the offense. Further leniency is not warranted.

A ten-year sentence also promotes respect for the law. The Defendant is a long-standing

---

[11] Of note, the Defendant live-streamed himself following his arrest in Georgia for this case. During the video, the Defendant is seated in the back of a police cruiser, claims to not have a license and gives a false name of "Ernest Brown" to officers. The government has reproduced a copy of this video on Exhibit 1. See Exhibit 1, "Pesci in Cuffs in Back of Cop Car.mp4." It is believed that the case referenced in PSR ¶252, was charged based upon the false name that the Defendant provided. The Defendant remains in warrant status for both pending Georgia cases (PSR ¶¶252, 253).

offender whose crimes have historically targeted others. The Defendant's membership in the Caruso DTO did little to change that, and only provided him with access to greater weaponry and cash. The Defendant's ability to generate notoriety for himself and Vincent CARUSO was a significant aspect of this case.  On its own, the Defendant's public facing persona is something of an affront to the criminal justice system. The Defendant's videos essentially derided the potential of investigation and prosecution – throwing illegal firearms around, issuing threats to members of the community, identifying those who speak with law enforcement as "rats," admitting to shootings and historical violence on the internet, and essentially mocking his rival drug dealers, victims of his crimes, and law enforcement.  A swiftly imposed sentence of 120 months promotes respect for the law in every sense, and directly addresses the specific disrespect for the law for which the Defendant was the auteur.

Just punishment for this Defendant must also be considered. Surveying his criminal history and crimes here in the aggregate, there is no doubt that the Defendant is a violent and dangerous personality whose aspirations of internet-stardom masked serious crimes.  In this context, just punishment must significantly escalate from the relatively light sentences he has received in the past for his troubling crimes. It's clear that the prior sentences only emboldened the Defendant and his conduct. The Defendant's conduct has since moved into providing security for a DTO that distributed kilograms of fentanyl and wielded machineguns to target rivals.  Just punishment must reflect a similar escalation in the prison sentence. As such, justice would be well-served by the 120-months being sought by the government.  All told, a sentence of 120-months, in this context, sends the proper message and would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### D. Deterrence and Proportionality

For this Defendant, general deterrence takes on a very significant role, and must be considered carefully.  This Court should be mindful of the message sent to offenders who would seek notoriety on the internet by committing violence and boasting about it openly. Videos such as the ones generated

by the Defendant can be shared in an instant, and a sense of lawlessness in a community can be created overnight.  This can swiftly undo years of work by residents and law enforcement to make their community feel safe.  For this case and this Defendant there must be a strong message of a general deterrence sent to those who would use the internet to amplify violence and send threats, or use an internet platform to display their arsenals of weaponry. This Court must send a message of general deterrence that is clear and direct: society will not accept felons possessing illegal firearms; and society will not accept threats and narrations of historical violence on the internet. For this Defendant, a 120-month sentence imposed promptly, without litigation, in the context of a plea to an Information, sends this extremely clear message to those that would degrade their community and its sense of safety by way of the internet.

Specific deterrence to this Defendant individually would also be well served by a 120-month sentence. This Defendant must be deterred from ever considering possessing a firearm or threatening others ever again. In short, the Defendant must find other outlets for his talents besides shooting at rival drug dealers' homes and bragging about it online. See Exhibit 1, "Yo Pesci Facebook - 2021.06.25 - Hell to Pay Video.mp4".  There simply cannot be any further threats, or shootings by this Defendant, or firearms in his possession. The Defendant must be deterred from these crimes, and 120-months is the proper means to do so.

A 120-month sentence is also proportional and commensurate to the case as a whole.  See PSR ¶6.  The leader of the DTO, Vincent CARUSO, received a well-deserved sentence of 250 months, which was a 10-year downward variance from the applicable GSR.  See 21-CR-10312-DJC, ECF #89. Laurie CARUSO, the mother of Vincent and a prolific distributor of fentanyl in her own right, received 108 months, also a downward variance.  See 22-CR-10022-NMG, ECF #67. Nicole Benton has pleaded guilty to charges carrying a 10-year mandatory minimum based on a firearm recovered from her residence and drugs.  See 21-cr-10258-ADB, ECF #49 (Plea Agreement).  The Defendant certainly sits below Vincent CARUSO in terms of culpability but presents with a much greater criminal history than

Laurie CARUSO, the DTO's primary distributor.

Here, the government's recommendation of 120 months reflects a downward variance that is appropriate for this Defendant in context, but still holds him accountable and imprisons him proportionally to his codefendants.  As the PSR makes clear, the Defendant was not the prime mover in the DTO, nor did he call the shots.  Furthermore, the Defendant resolved this case promptly, by Information, with assurances of discovery related to the numerous cooperating witnesses being protected (e.g., Assented-to Protective Order, ECF #12), and without any litigation or contesting of any facts or forfeiture. Absent these considerations, the government certainly would have sought additional counts and a greater sentence closer to the high-end of 14 years, or held the Defendant specifically accountable for the DTO's drug weight.  In the end, it was not necessary to do so: the Defendant was willing to plead guilty a count that allowed the government to request, and gave the Court the ability to impose, the proper sentence, which is 10 years. All told, the government's recommendation of 120 months is just and deserved punishment for this offense.

### E.      Public Protection

As a final factor, the Court must protect the public from violent, drug dealing offenders such as this Defendant, whose internet persona put forth a brazen combination of comedy and fear.  By comparison to any conditions of supervised release or parole, this Court can be assured that only incarceration will protect the public from the Defendant.  Over the years, the Defendant has repeatedly failed on prior stints of Probation and committed crimes while incarcerated or while subject to monitoring.  Incarceration is the only option to ensure public safety.  Given the conduct, firearms, threats, and shootings at issue in this case, this Court should ensure that for 120 months that the Defendant cannot carry dangerous firearms, shoot at others, pollute the internet with threats and claims of violence, or devastate more lives through his association with fentanyl distributors.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence the Defendant to a term of imprisonment for 120 months, followed by three years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY
First Assistant United States Attorney

By:     */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   December 6, 2022

List of Exhibits
1. Compact Disc with Recordings and Videos
2. Photographs from 12 Fremont Place, Lynn
3. Photographs from the Red Roof Inn
4. 2021.06.28 – Arlington Street Shooting
5. Crime Laboratory Report Linking Machinegun Recovered to Arlington Street
6. Court Papers Related to Docket No. 19-205
7. Govt' Sentencing Memorandum filed in U.S. v. Vincent Caruso, 21-10312-DJC.