IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

*UNITED STATES of AMERICA,*

    v.                                     Case 1:22-cr-10103 LTS

*ERNEST JOHNSON,*
      Defendant.

DEFENDANT'S MOTION FOR SENTENCING VARIANCE
AND SENTENCING MEMORANDUM WITH MEMORANDUM OF LAW

Defendant, Ernest Johnson, by his counsel, Kevin L. Barron, Esq., respectfully moves the Honorable Court for a variance from the November 10, 2022 PSR's determination of a Total Offense Level ("TOL") 29, Criminal History Category ("CHC") V Guidelines Sentence Range of 140 to 175 months.  Mr. Johnson requests variance to CHC IV/TOL 23 (GSR 70-87) and a further two levels to (GSR 57-71) for a sentence of 60 months based on his objections and the facts and arguments discussed below.

Mr. Johnson asks the Court to vary downward to the plea agreement's bottom of five year as follows:

A.   <u>Number of Guns, Seven or Less</u>  (Two Offense Levels)

    1.   Defendant Has Reserved the Right to and Does Object
        to the Government's Attribution of Eleven Guns

Defendant has objected to the attribution of eight or more guns under §2K2.1(b)(2).  The plea agreement allows defendant to object to the adjustment for 8 to 24 guns and to maintain that as few as three guns are attributable to him.  Doc 52, p. 2.

Defendant has objected formally to this §2K2.1(b) adjustment. (Defendant has not "acknowledged" that he possessed seven firearms as stated in the government's Sentencing Memorandum. Doc. 71, p. 2.; cf. Plea Agreement, Doc 52, p. 2) Defendant has admitted that USSG §2K2.1(b)(1)(A) for possession of three to seven firearms applies to him and has reserved the right to contest the government's assertion of eight to 24 firearms. Defendant's December 5, 2022 Objections to PSR, Objection No. 2. Concomitantly, defendant seeks a variance from the four-level increase of eight to 24 firearms.

    2.    The Government's Gun Count is Inflated

Although agents seized ten guns from the Caruso conspiracy and gathered many photographs and videos of guns, several of the guns actually recovered cannot be fairly attributed to Mr. Johnson even if attributable to the Caruso conspiracy (of which Mr. Johnson has not been convicted). Furthermore, pictures of guns should not be used to increase the gun count if the gun has not been seized or demonstrated to have been designed and intended to be a firearm (and not a non-functioning gun replica).

Even if all the guns seized belonged to the conspiracy, it does not mean that all were foreseeable to Mr. Johnson. That, however, is what the government attempts to do. Several of the firearms listed in its Sentencing Memorandum (Doc. 17, p. 3)

cannot be shown to have been actually or constructively possessed by Mr. Johnson.  It should be noted also that a majority of the pictures of individual or multiple guns in government Ex. 1 come from Caruso's account "Fatz".  These images and videos depict a gun in a tattooed Caucasian hand that is easily identified Caruso's.

    3.   Some Guns Not Foreseeable for §1B1.3 Purposes

The principle of foreseeability of course applies to "jointly undertaken criminal activity" the theory on which the government seeks to attribute guns for this offense level adjustment.

> [S]pecific offense characteristics . . . shall be determined on the basis of the following;
>
> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i)  within the scope of the jointly undertaken criminal activity,
>
> (ii)  in furtherance of that criminal activity, and
>
> (iii)  reasonably foreseeable in connection with that criminal activity;

USSG §1B1.3.

The foreseeability of specific guns is the only sensible interpretation of §2K2.1(b)(1), otherwise, where it is foreseeable that guns would be used in the conspiracy, there

would be no limit to the offense level adjustment in conspiracy cases.

The Government's Sentencing Memorandum (Doc. 71, p. 3) lists these contested firearms:

> "2.  White AR-style rifle recovered on May 5, 2021 (see PSR ¶¶68-78)".

The government offers a photograph of a rifle and claims it is the same one retrieved from a dumpster after an attempted robbery.  Here, however, the government admits that the rifles[1] in the photographs have differences[2] and are only *consistent* or *similar*.  If the government cannot state that the rifle is the same as the one seized, then it is asking the Court to speculate, not make a finding on a preponderance. See, PSR ¶75[3].

> "4.  Smith and Wesson, .357 caliber revolver, bearing serial number 17548 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)".
>
> "9. Ruger Redhawk .44 magnum revolver, bearing serial number 50404788 (recovered from 12 Fremont Place, Lynn; PSR ¶¶122-125)

---

[1] This purported rifle as depicted, if it is not a replica or deactivated weapon, would be a handgun subject to the Gun Control Act of 1968 and not a prohibited Short Barreled Rifle subject to the National Firearms Act of 1934.
[2] The government has suggested that this is a 7.62mm rifle and a 5.56mm.  A rifle of this style cannot be converted from one caliber to another.
[3] "Comparison of the rifle in the photograph to the recovered AR-style rifle reveals that they have similar, if not identical receivers, barrel shrouds, and both do not have a typical rifle stock. The AR-style rifle in the photograph and the AR-style rifle recovered have only a buffer tube extending from the rear of the receiver.  The magazines depicted in the photographed rifle and recovered rifle are also consistent. There is a slight distinction between the flash suppressors, though it may a result of the angle of the photographs."  PSR ¶75.

Mr. Johnson cannot be shown to have possessed these revolvers in the relevant times and he was not in control of them nor did he live in the location where the revolvers were seized, 12 Freemont Place in Lynn.  All the pictures of Mr. Johnson with guns or purported guns show some form of semi-automatic pistol, not revolvers.

> "11.  Tan and black Springfield XDS .40 caliber firearm, depicted in videos but not recovered (e.g., PSR ¶¶109, 173, 174; Exhibit 1)"

The government cannot assert with certainty that this was a real firearm.  This alleged gun has not been recovered.

Merely reducing the total of guns from eleven to seven does not end the analysis for two reasons.  First, it cannot be ruled out that some guns are replicas and, secondly, it is difficult to determine whether the images put Mr. Johnson in possession of the guns seized.

   4.   Rule Out Replica Guns

The government has not ruled out that some alleged firearms depicted in images of Mr. Johnson are replicas.  The issue of replica guns is *not* speculation.  The government has raised the issue of replica guns by producing videos in which Mr. Johnson called some guns "props".  One of the government's set of three videos shows Mr. Johnson handling what is clearly a replica of a Beretta Model 1951.  See "screen grabs", Ex. A.  In the video, Mr. Johnson identifies this (inconsistently) as a "prop gun".

Counsel believes this is a replica because, unlike most of the other video and images produced by the government, this video of Johnson shows a close up of the purported firearm with its slide locked back revealing some of the inner workings of the pistol, particularly the barrel and muzzle.  The absence of a tilted barrel when the slide is locked in the rearward position and the unusual semi-circular and rectangular shape of the muzzle demonstrates that Mr. Johnson is holding a replica and not a real firearm.  In a locked breach pistol like the Baretta 1951 (or countless other pistols, e.g., the Glocks), once the slide is held back by the slide stop, the barrel protrudes from the slide in a slightly tilted-up position.  The pistol in the video, on the other hand, shows that the barrel is part of a rectangular assembly that does not tilt from the frame.[4] Moreover, there is no real firearm that has a muzzle shaped like the one depicted.  (Compare the first image of Mr. Johnson's replica with the second image.)

    5.    Which is Which

The Government does not identify images of Mr. Johnson specific to each of the guns it claims he possessed.  The videos depicting Mr. Johnson with what the government claims are guns often do not show these objects with sufficient clarity to determine which gun is involved.  Some of the seized pistols are

---

[4] There are less powerful rounds that operate without a locking breach, but that is not the model of pistol shown.

more unique than others, like the green small Glock. Others are largely the same size and color, like the various black or tan plastic-framed pistols including the Glock 17 or the Glock 36.

    B.    <u>"Obliterated" Serial Number Not Obliterated</u>
          (Four Level Reduction)

    1.    Serial Number Not Actually Obliterated

Defendant asks the Court to vary from and set aside the four-level obliterated serial number adjustment of §2K2.1(b)(4)(B) even though the application notes claim that a defendant's knowledge is irrelevant. See Objection No. 3; application note 8 B to USSG §2K2.1(b)(4). Even if one serial number had been completely obliterated (and it was not), the other two had not been tampered with and were clearly visible, so the serial number has not been "obliterated" from the gun. The gun in question, a common Glock 17, has its serial number permanently impressed or affixed in three places, once struck into the slide, again struck into barrel breach and a third on a permanently-affixed metal plate embedded into the frame.

    2.    Imposing Adjustment Does Not Serve §3553(a) Purposes

Imposing the adjustment in this case is an area where the Guidelines do not serve §3553(a) purposes. Even if the "obliterated serial number" adjustment applies, there is no legal justification to impose it. There is no evidence that Johnson personally attempted to obliterate or tampered with a serial number. There is no evidence - such as one of Johnson's

many video recorded statements - that Johnson would have been aware that possessing the gun in this condition was a separate offense.[5]

Even if the Court accepts the application note - and it should not - there is no evidence of which counsel is aware that the serial number had been tampered with before the time in which Johnson may have handled the gun.  Defendant does not deny that the Glock 17 should be counted.  The government merely seized the Glock 17 in executing search and arrest warrants and found it to have a scratched serial number.  The government found a video on Vincent Caruso's phone showing that Mr. Johnson was driving when Caruso pulled out the Glock 17 with selector switch and filmed it.  Johnson did not physically possess the Glock 17 with the selector switch in place[6], although it is extremely difficult to tell from most videos of Mr. Johnson what alleged gun he is showing.  At least with respect to Johnson's admission of possession of the Glock 17, the gun is seen clearly in Mr. Caruso's hand on video and Mr. Johnson is driving; that admission was made on an accessory basis.  *United States v. Medina-Román*, 376 F.3d 1 (1st Cir. 2004) citing *United States v.*

---

[5]  See, USSG 2K2.1(b)(4) and application note 8 B making the defendant's knowledge of the obliterated serial number irrelevant.  Such an application note encourages increased punishment without due process and exactly where *Kimbrough* permits, even encourages the Court to vary.

[6] In this case, the machine gun is not the Glock pistol but, rather, the selector "switch" or sear altering mechanism that attached to the back of the Glock's slide.  A machine gun is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun".  26 USC §5845(b).

*Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.), cited with approval *Nye Nissen v. United States*, 336 U.S. 613, 619 (1949)(to aid and abet, defendant associated with venture, participated to bring it about and sought by his action to make it succeed).

C.  Criminal History is Overstated
    (Reduction of Criminal History Category from V to IV)

   1.  Scoring Convictions Related to Defendant's
       Condition is Excessive

Mr. Johnson's criminal history is overstated for the reasons explained in Dr. Welch's report and diagnosis. Mr. Johnson's two convictions for assault and battery on corrections officers with overlapping offense dates (Doc. ¶¶245 & 246) are bound up with this diagnosis. Increasing Mr. Johnson's punishment in this case based on these four points penalizes the symptoms of a condition for which he is not at fault.

Counting the criminal history points of these convictions unfairly increases Mr. Johnson's CHC from IV to V. USSG Table 5A. Mr. Johnson was in solitary or disciplinary confinement when these offenses were committed and was trying – perhaps not rationally – to interrupt the trauma of his strict confinement. As Dr. Welch explains at the bottom of page eight of his report, the provocative conduct of those offenses is related to a disorder that goes back to his childhood and that solitary confinement exacerbates its effects.

Counting these convictions for a defendant with defendant's condition is excessive, regardless of how obnoxious and repellant the conduct. It heaps punishment on punishment. Mr. Johnson was punished immediately after the assaults by the usual forced entry procedure and restraints. Then he was given more strict confinement before being charged. Afterward, he was committed to consecutive prison sentences of six (PSR ¶245) and twelve (PSR ¶246) months.

Increasing Mr. Johnson's CHC by one category will have a significant effect even at a reduced TOL. If the Court agrees to vary downward from the four levels for "obliterated" serial number and another two for the number of guns, Mr. Johnson would be TOL 23. Even at this offense level, the scoring of these offenses ads a minimum of 14 months to GSR. Table 5A.

    2.   More Confinement Exacerbates Condition

The longer the sentence the Court imposes, the more likely that defendant will be committed to a United States Penitentiary. Of course, a defendant's offense conduct earns his punishment and he must live under whatever lawful sentence a court imposes. The difference in Mr. Johnson's case, however, is the effect that serving a sentence at a USP – typically Hazelton – will have on defendant's condition. Confinement at a USP is likely to exacerbate defendant's condition. Given that defendant's security level may place him in a USP, shortening

the defendant's sentence would mitigate the effect of defendant's confinement on his medical condition.

The increased pressures of confinement at a USP are undeniable. Prisons are understaffed and becoming tense and more dangerous. "Amid a nationwide worker shortage in various industries, prison systems across the country are desperate to reverse an exodus of corrections officers that administrators and prison experts describe as the worst ever." Montgomery, D., September 26, 2022, "Prison Staff Shortages Take Toll on Guards, Incarcerated People", Pew Charitable Trusts website.[7] The BOP is no exception:

> The federal Bureau of Prisons has faced staffing shortages for years, which has led to increases in overtime, low morale and overworked staff. Nearly one-third of federal correctional officer jobs in the United States are vacant, forcing prisons to use cooks, teachers, nurses and other workers to oversee prisoners through a process known as augmentation.

Pavlo, W., March 31, 2022, "Bureau Of Prisons Is Overworking Its Most Critical Staff Positions During First Step Act Implementation", Forbes (on-line magazine).[8]

The staffing shortages exacerbated by COVID have led to ever more restrictive confinement:

---

[7] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2022/09/26/prison-staff-shortages-take-toll-on-guards-incarcerated-people

[8] https://www.forbes.com/sites/walterpavlo/2022/03/31/bureau-of-prisons-is-overworking-its-most-critical-staff-positions-during-first-step-act-implementation/?sh=73c2965d59e5

> Inside prisons, growing shortages mean a rise in lockdowns.  Restrictions that might have begun as a way to stop the spread of COVID-19 have continued because there aren't enough guards to supervise activities.  Some incarcerated people say they can't take classes, participate in group therapy sessions or even work out in the recreation yard or take a shower.  That can force those in general population into de facto solitary confinement, and those already in segregation into near-total lockdown.

Associated Press, November 21, 2021, "US prisons face staff shortages as officers quit amid COVID".[9]

D.   Defendant's Dangerousness Overemphasized

    1.   Criminal History Indicates Defendant
Not as Dangerous as the Government Maintains

Defendant, although associated with the Caruso conspiracy, is not so dangerous as the government makes him out to be.  See, Government's Sentencing Memorandum, "Deterrence and Proportionality", Doc. 71, pp. 21 - 23.  While the government tries to hold defendant's internet celebrity against him as evidence of a dangerous, lawless character, his record of convictions tends to show otherwise.  The defendant's criminal history (PSR ¶¶239 - 248) for a 34 year old man in his circumstances is significant but comparatively mild.  Four of defendant's convictions include unscored motor vehicle offenses. PSR ¶¶239, 240, 247 & 248.  He has a string of two-point convictions (none resulting in a sentence of more than 13 months) for violation of an abuse prevention order (PSR ¶241, no

---

[9] https://nypost.com/2021/11/01/us-prisons-face-staff-shortages-as-officers-quit-amid-covid/

police reports of offense received), an abandoned unlicensed firearm improperly stored with defaced serial number (PSR ¶242), telephone threats to commit murder (PSR ¶243), simple possession of Xanax for acting out in prison crushing and snorting pills (PSR ¶244), and the two assaults on corrections officers discussed above (PSR ¶¶245 - 246).

Only the violation of a protective order is possibly a categorical crime of violence.  The threat to commit murder would not qualify as a true threat under *Ellonis*.  *Elonis v. United States*, 575 U.S. 723 (2015).

Defendant has developed a form of internet celebrity by acting like he is a more serious criminal than his record proves him to be.  Some of the material simply funny and non-threatening, like the video of a rotund Mr. Johnson doing cartwheels. Indeed, the videos are wildly boastful and unfortunate in the context of a criminal case.  See Government Ex. 1.  But the government loses sight of defendant's real intention of garnering thousands if not millions of internet views.  (The government will admit that one of defendant's social media videos has two million views. )

It did not matter to Mr. Johnson to promote a conspiracy; the criminal conduct provided a specific subject matter for videos and for acting out.  The government tries to portray the

video making as the work of an "enforcer" threatening a rival drug gang.

> The Defendant played a rather unique role as something of an internet spokesman for the DTO and its activities. He live-streamed videos that threatened rival drug dealers, accused people of being informants for law enforcement, showcased the DTO's arsenal of firearms and large-capacity magazines, and promoted the DTO's reputation for violence and gunplay. In short, after trading in death and misery, the Defendant would then take to the internet to brag about his exploits and explain his willingness to commit violence against rivals of the DTO.

Government's Sentencing Memorandum, Doc. 71, p. 21.  The facts, however, show that Mr. Johnson did not "trade in death and misery".  When Caruso ordered a retaliation shooting of rivals, Caruso did not call on Mr. Johnson for the task.  Caruso gave that to another person, Darwyn Mejia, as the June 29, 2021 shooting in Lynn shows.  PSR ¶¶111 - 116.

The government offers much evidence about Caruso's distribution conspiracy but has far less about Johnson's participation in it, hence defendant's Objection "1." cautioning about the government "bulking up" of Mr. Johnson's offense conduct.  This is an important distinction for §1B1.3 purposes. The videos of operating pill presses and bags of thousands of pills come from Caruso's phone and are posted to Caruso's account.  Johnson is not depicted and not heard on the audio.

Defendant has not been shown to have participated in drug profits or in significant distribution of drugs.  There is one

short message string in the extraction of a phone where D says he does not sell "less than 50". But then there is no other communication about distributing drugs. There are also a few surveillance reports of him bringing bags into or out of suspected drug locations, but no confirmation of drug deliveries or pick ups. Moreover, the government does not cite its five CW's identifying Johnson as a participant in the conspiracy. Historically, Mr. Johnson has no convictions for distribution. He did not arrange the supply or distribution of fentanyl or its production into pills.

## CONCLUSION

For the reasons set forth above, the Court should vary downward to a sentence of 60 months.

Dated: December 8, 2022

Respectfully submitted,
ERNEST JOHNSON, defendant,
By his counsel,
/s/Kevin L. Barron
Kevin L. Barron, Esq.
50 Congress St. - Ste. 600
Boston, MA 02109
(617) 407-6837

## CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of these objections to be served today on US Probation Officer Crystal Monteiro through her electronic mail of Crystal_Monteiro@map.uscourts.gov and on AUSA Philip Mallard through his electronic mail of Philip.Mallard@usdoj.gov. No party requires service by other means.

/s/Kevin L. Barron